Case 13-5796 James Martinez v. Samuel McGraw et al. Oral argument, 15 minutes per side. Mr. Ramey for the appellant. Good morning Chief Judge Batchelder, Judge White and Judge Boggs. May it please the Court, my name is Bill Ramey and I represent the appellant and the plaintiff James Martinez in this case. I'd like to reserve four minutes from my rebuttal if I may. May I begin? You may. James Martinez would ask this court to overturn the granted summary judgment from Todd Campbell and District Court in the Middle District of Tennessee based on three points of error that the court misapplied the law to the facts. The court in the Middle District of Tennessee required the plaintiff produce someone who could testify that they gave a copy of the copyrighted cassette to one of the defendants. As this court knows, inference of access is allowed to establish access and then substantial similarity to establish copyright infringement. That standard goes back to proving direct copying which we're not doing, we're using the other standard. The second point of error that we would allege is even if the court were to find an inference of access, an inference of copying, the defendants either one completed their work prior to or two began and substantially started and or completed their work. Here we have stipulations on the record the plaintiff made or wrote his song prior to the time that every word was written. So that element goes away and the District Court judge shouldn't consider that evidence and was error to do so. And the third point of error from the District Court is that he didn't do a substantial similarity analysis, never looked at striking similarity, in fact held that because our expert was struck by him, he didn't have to consider that element. In this court, going back to close for Mary Hall case, it's held that expert testimony, while relevant to the first part of the similarity analysis, is not relevant to the second part, the ordinary observer. So an expert is not necessary and so we contend that those are the three points of error that the District Court made. Basic facts in this case are that Martinez is a singer-songwriter from Corpus Christi who in August of 1996 developed a song, Anywhere, Anytime, Amanda and copyrighted that collection. He then gave that cassette to a woman named Susan Tomac. Susan Tomac took that cassette and gave it to people, two people named David Bartley and Karen Phillips and said, please give it to the people that you know that are connected to the music industry. Both David Bartley and Karen Phillips lived in Nashville, Tennessee. At this point, let me stop you one second. Yes, your honor. I read the record, there is direct evidence that he gave it to Bartley, that beyond that it relies on inferences or ambiguous testimony by Bartley's widow. Is that fair? No, your honor. Actually there's deposition testimony from James Martinez and the original petition was written back in 2007 to say that the Susan Tomac said he gave it to a dressmaker. That dressmaker was later identified to be Karen Phillips. So James Martinez was deposed, said she gave it to Susan Tomac gave it to the dressmaker. So we have two pieces. We have one coming in from James Martinez and one coming in from Susan Tomac saying that she gave it to David Bartley. Okay, but wouldn't that be hearsay as to if you're saying Martinez said, Tomac said, she gave it to a dressmaker. President's impression it should come in as, I mean he got the impression that he asked her to give it to someone connected to the music industry and she said, sure I'll do that and here's who I gave it to by the way, when you talked to her several months later and this came up in his deposition, which I believe is record number 296 in this case. So was Tomac asked directly, did she give it to a dressmaker or to Phillips? She said in deposition she said that she did not, correct. So I see what you're saying your honor, but if, to go on from there, but she did tell James at least that she gave it to the dressmaker as well. Was there testimony from Phillips? Was there a deposition of and she said she did not receive it your honor, but again that's competing evidence and of course the plaintiff gets all inferences of fact. We're not here to weigh or judge the credibility. In fact, the district court did a lot of, we would allege, weighing the credibility of witnesses. What if she did get it? What if we say the dressmaker got it? Yes ma'am. Then what? Yes ma'am and that's my point. So what this court, what this court has allowed for inferences of access is to show some line of communication with some attendant circumstances that show that it's reasonably possible that the copyrighted collection was put before the defendants. In this case Reid Wiseman would be best for us, but the producers we think work as well. And we get there by showing that each of Karen Phillips and David Bartlett were working with Lee Greenwood and Kim Greenwood. Lee Greenwood was deposed and said yes I know David Bartlett, yes I know Karen Phillips, she's the person that does my dresses. But knowing them, isn't that an enormous jump to say I know them and that means that I had the tape, the cassette? Yes your honor, it's not an enormous jump. It falls exactly along the case law from this court that it put out going through Jones v. Blige and when Jones, and then going through the brainer very fast, this access is not supposed to be a stumbling block for plaintiff not to be able to surmount. We're just supposed to show some evidence that a court, a trier of fact, could rest its decision on. And that's what we've done. We've produced sworn testimony by third-party witnesses and by our own witnesses, James Martinez, of where the cassette went. We're able to show that it gets into the hands of David Bartlett and Karen Phillips. And from there they had a close relationship and were communicating a contractual relationship, in fact, with the Greenwoods who were working with Curb Records, the defendant in this action, who was also working at When this cassette made it there, we allege, and when it was made available to the writers in this case, Reid and Wiseman. All that this court has required in the past from its various cases is that we establish a reasonable... So wait, so your theory is that Wiseman and his partner did not bring it to the record label that it was the other way around. That they heard it and told them to go ahead and copy it. No, actually your honor, we have two different theories of access. That this is the problem, and it's what this court has alleged, has rectified, has noticed in the past. It's hard for us, once a cassette is on the inside, to prove exactly who gave it to who. And it's what the district court did incorrectly by saying that because they didn't point to a person who gave it to defendants, that's why I'm throwing their case out. What we're able to allege is that it got to Lee Greenwood, who then has, who gave it, who always gives his cassettes to his agent, Ralph Gordon, also his attorney. And Ralph Gordon said and testified, told Gerard Stranch and me in conversation, that he passed on hundreds of cassettes for Lee Greenwood to music companies, to publishers, to record labels, to songwriters, anyone he could, and he was paid handsomely for that. The record has that evidence in it. And then... Gordon was deposed? Yes, your honor, and he admitted telling us that, and then so after he talked to counsel for defendants and Lee Greenwood, he changed his testimony. That's in the record as well. He didn't change his testimony until after he talked to counsel for defendants. He never said he passed this on, he just said, look I get a hundred of these, I get hundreds of these, I pass them on. That's correct your honor, that's what he said. And he said he passed on cassettes, he passed them on to publishing companies, he passed them on to recording artists, record labels, whoever he could get, and that he was paid handsomely for that. So then we get the cassette from Ralph Gordon going to Alamo Music, and it gets in Reid Wiseman, they hear it. We're only looking for a reasonable opportunity here, and then once you get that reasonable opportunity here, then we get to the next... Do you have any case that in effect includes this many steps? As I understand the reasonable opportunity to hear usually is, you know, the tape is in the company and I work for the company, or the tape is in the records radio station, and I work for the radio station. What you've got here is it gets to Bartley, then there's an inference to Phillips which rests only on the hearsay statement, and then there's an inference that it gets to Greenwood, and then there's an inference it gets to Gordon, and then there's an inference it gets to Alamo, and then it gets to Reid and Wiseman. Your honor, even if we don't take the Phillips part of the equation out, Bartley transmitted to Greenwood because he had a close relationship with Greenwood too. That's not a... That, you've got no connection at all other than general relationship, right? There was this photographer and took all their pictures for the wedding and for the Pigeonhole Ford theater contest. But yes, the case that we rely on is the Jones v. Bly's case that was affirmed by this court, the district court ruling, cited a case Sanford v. CBS, where they basically said we're looking for some evidence. We're not here to judge. That was out of the Northern District of Illinois, pardon me. In that case, we're not here to judge the facts. Just some evidence at this point is all we need. But that was some evidence of an actual occurrence, not some evidence that there might have been an occurrence. Actually, your honor, no one ever said that they did listen to it in the Sanford case. It said that one person said, look, I'll make sure it's made available. That's the same thing we have here. David Bartley said... Nobody... But if the one person David Bartley might have given it to were the place where this stops, then maybe that would be comparable. But that's not at all where it stops. If you go to the preeminent expert on copyright law, Professor Nimmer, he contends that even when you have, as was pointed by Judge Boggs, these many points of access, these are behind the curtain for us. We can't see what's going on. All these people have contractual relations with one another. We can't tell exactly what happened. That when they have a line of communication and there's some attendant circumstances, that should be enough to establish access. Here we're able to establish that access by showing that these people were communicating and communicating about music. At the time, McGraw was at Soundstage Studios recording Everywhere, what became the album Everywhere. And he was able to... Everyone knew that people were submitting songs, so there was the communication exactly about this song. People knew what Reid Wiseman liked to sing. Mike Reid had written songs previously. Quickly to get to my last two points, if I may. We were not allowed to depose necessary people to prove access, even in this case, completely. We weren't allowed to depose all music. The person who had the song book, pardon me, and we were not allowed to depose Tim McGraw, who's a producer on this album, and the record label, so we had to have proof of access. But the issue isn't... What would you have... What do you think you would have gotten from the people you wanted to depose? Yes, Sharon, good question. Have we been able to depose Alma Music? It's our belief that what we would receive from Alma Music is who plugged the song to Missy Gallimore? Remember, there's testimony in the record that someone from Alma Music plugged that song, one of the people who proposed that song, to Missy Gallimore. But by then it was already written. But at that point there's also a record... Yes, Sharon. But why is that relevant? Because there's records of who, where the money was paid for that, for that instance, who has paid money. If an outside song plugger plugged it to Alma Music, that record would be in the system too. If someone gave that music to Alma Music, then was converted and written. Remember, Missy Gallimore has evidence in this record that she had the ability to critique and control output from her songwriters, and she went back frequently and asked them to change things. So if they're... McGraw was doing this album he was preparing, and there was evidence in the record that if we had that evidence that someone from Alma Music was paid for plugging the song or referring the song, that would help us in our access case. I don't understand. You haven't explained it to me, because the person was plugging a completed song. We don't know that at this time, Your Honor, because we weren't allowed to talk to Alma Music. We know that they said they wrote the plug somewhere between November and December of 1996. We know that it was changed a little bit by McGraw when he sung it. That's in the record, but at some point from October, September to October of 1996, James Martinez's song arrived in Nashville, and it was given to Lee Greenwood to give to someone, to Ralph Gordon, to get someone to help him produce this, to help plug this, and at that point... Did you take the testimony of Greenwood? Yes, Your Honor. What does he say? He says that he did pass on cassettes from other people, and this is in the record. All the defendants said that they passed on unsolicited cassettes to other people to get them done. He says he does not remember hearing James Martinez's music, and he... I thought he said he didn't. He didn't. Pardon me, Your Honor. He did say he didn't, but he said he doesn't remember ever hearing this, and no one's ever identified the music to him of James Martinez. That's what he said, and so that... I'm trying to clear the record that it's a little bit ambiguous if you take the facts reasonable to the plaintiff. What he said is, no one ever identified to me that I was listening to music of James Martinez, but he does admit the cassettes that he received would have been labeled with someone's name and address, exactly as my client, James Martinez, did. And I thank you very much, and I'll revoke the rest of the record. Good morning, Your Honors. May it please the Court, my name is Tim Warnock, and together with Mr. Vallejos, we represent the District Court, affirmed the District Court Grant of Summary Judgment from March 13, 2013. The District Court wrote, plaintiff's claim of access is based solely upon speculation and conjecture. There is no probative proof offered on this issue to establish defendants had access to plaintiff's song, and we believe that, or the apologies submit that that is an absolutely correct finding on behalf of the District Court. Preliminarily, both Mr. Wiseman and Mr. Reed offered unrebutted testimony of independent creation of their song. Well, that hardly is the most compelling evidence. I mean, if all you have to do is say, no, we did this by ourselves and the case is over. It's not over. I certainly agree with that, but they did both testify that they wrote the song, they testified how they wrote the song, and there is no proof that anyone other than Wiseman and Reed participated in the creation of the allegedly infringing song. Did they testify that they had not heard the Martinez song? They testified they had not heard the Martinez song, they testified they didn't know who James Martinez was, they testified that they had never met with or even heard of him until this lawsuit, and Martinez himself, at page identification 3247, in record entry 296.1, admitted that he had never had a conversation with either Reed or Wiseman, and he concedes that no one ever told him that a copy of his song made it to either Reed or Wiseman. And, even if it had, Anthony Ricigliano, the expert musicologist, testified that he did not locate any protectable musical material in the instrumental parts of Everywhere that may be considered to be substantially similar to those in the plaintiff's work, and that appears at record entry 290. As this court knows, the appellee, our client, are entitled to summary judgment if Mr. Martinez fails to make a sufficient showing of an essential element with respect to which he has the burden of proof. As this court held, among other cases, Ellis against Diffie, the plaintiff in a copyright case bears the burden of proof on both access and substantial similarity. The plaintiff can meet his burden on neither of those points. Regarding access, the test, as articulated by this court in Blige, is essentially hearing or having a reasonable opportunity to hear the plaintiff's work. If this had been unmistakably based on the first song, we wouldn't really be talking that much about access, would we? That's an interesting question, Judge White. There is a doctrine called striking similarity. It, I believe, has been misconstrued over the years to hold that no proof of access is required. Striking similarity actually maintains that if no other possible explanation for creation exists, then a jury or fact finder can infer proof of access. But generally, I would concede there's certainly a sliding scale between the level of similarity and the strength of the access proof. But here, Mr. Sigliano testified there was no similarity, and I believe a close examination of the record reflects that really this case was brought on the premise that the ideas underlying the two works are, in the plaintiff's view, the same, and as this court knows, ideas are not protectable by copyright. It's only expression that's protected, and that's where the plaintiff's case fails. He has neither access nor substantial similarity. Judge Boggs, you're absolutely correct that the access, you can look at it two ways. You can look at it from the writer's perspective backwards or from the plaintiff's perspective forward, and there is no proof that bridges either gap. Ms. Tomac did testify that she gave the plaintiff's tape to Mr. Bartley. Mr. Bartley died before he was ever identified to us. We don't know if anyone else ever had a conversation with him. There is no admissible proof that plaintiff's tape went beyond Bartley. Ms. Phillips, the dressmaker, denies that she ever received it. The testimony from Mr. Bartley's widow and others is all speculation and conjecture. There's testimony that he was the type of person who liked to be in the middle of things, and this would be consistent with the type of thing that Mr. Bartley would do, but that's inadmissible, and even the testimony by Mr. Martinez that Tomac told me that she gave it to the dressmaker is, as Judge Boggs noted, inadmissible hearsay. A present sense impression is somebody saying, I'm cold or I hurt. It's not a license to repeat inadmissible evidence. The plaintiff's access theory has never been consistent and it's never been sound. The plaintiff first maintained that he gave his song to Amanda Little, who was a pageant participant. She testified that she did not ever take the song to anybody. His theories shifted to Ms. Tomac. Ms. Tomac has said that she gave it to Mr. Bartley. The theory then was that Mr. Bartley must have given it to Melanie Shelley, a hairdresser. That didn't pan out. Lee Greenwood said he never had it. There was a theory that there were shared musicians and performers. But when people say, oh, I never had it, I mean, I don't recall having it, there's also testimony that there are hundreds of these cassettes that are just passed around. People don't know whose it is. Somebody gives you something casually and you pass it on casually. Your Honor, what the plaintiff has done in espousing that theory is try to take a third-party intermediary theory that has been recognized and written about by this court in the Jones v. Blige case and recast the corporation, in that case which was Universal Music, as the Nashville community or the songwriting community or the community of musicians. That is too broad to sustain a finding of a reasonable possibility of access and moves clearly into the area of bare possibility of access. And this court, as well as, as far as I know, every other court has held that bare possibility of access is insufficient. There has to be a reasonable possibility of access. The plaintiff has no proof that his tape made it into the mix, whatever the mix is, a hundreds or any mix. He has no proof that his tape ever made it to the studio where the McGraw work was recorded. Well, people didn't still have it, right? I'm sorry, Your Honor. It was given, we got it as far as Brantley? Brantley, yes, Your Honor. Okay, it wasn't found in his possessions. There's no proof in the record either way on that. And there's certainly no proof that it was passed to anybody. And the plaintiff, as the bearer of the burden of proof we respectfully submit, is charged with the duty of showing a reasonable possibility that it went from Brantley to somebody. And all that is in the record is speculation and every theory for which he had some person to take a deposition, the proof ended up not favorable to the plaintiff. But even in the Jones v. Blige case, this court examined a tape that was passed to a large record company, Universal Music Group, and found that even within that company there was no way to reasonably infer that the allegedly infringed work made it to the alleged infringer because there was no connection within the company between those two separate camps. Just to be specific, the two cases the other side has talked about have been Blige and Sanford, which are ultimately cited in their reply brief. In Blige it was within a corporation. A corporation. And your submission is it still wasn't good enough. In Sanford, was that also all within CBS? It was submitted to one part of CBS and then went to other parts of CBS? I don't know the answer to your Honor's question. The Sanford case is discussed in the context of the Brainerd case. In the Brainerd case there was testimony that the plaintiff's work was given to Mr. Vassar's record company. That was bolstered by something called a pitch log that showed that the record company in fact had received the copy of the allegedly infringed work and that the company that pitched the plaintiff's song to the record company had a written record of it. There was also proof in the record that the pitch company then took the same work, the allegedly infringed work, to Mr. Vassar's manager. This is all, everything you're saying now is about Brainerd and Brainerd ended up saying there was enough access, is that right? Yes, the Middle District said it was a close call but there was sufficient proof of access. And then Sanford you're saying you're not as familiar with? I am saying that, Your Honor. The plaintiff's proposed rule, and the only rule that would allow his case to survive, appears at page 5 of his reply brief and it strips away any of the other elements of a reasonable possibility of access the courts have recognized. He submits that this court should find that the rule is that any communication on any topic between any two people at any point in time is sufficient to find that there is a reasonable possibility of access. There is no support for that theory or for that new rule in any case in this or any other circuit. And there's no case that he has cited that has found that result as well. Chief Judge Batchelder, you asked if it gets to the dressmaker then what? That's the perfect question. There is no proof that takes it anywhere beyond Bartley and there's no proof upon which a reasonable inference can be drawn. And Judge Boggs, you asked whether there was any other case with this many steps. I have not found any other case that has anywhere near this many steps. Because you have to get from Bartley to the writers and the writers absolutely deny they ever had it. They have offered their testimony about independent creation. That is unrebutted. Moving on for a moment to substantial similarity. The district court said that it was not going to decide the issue on substantial similarity because it didn't need to having found that there was no access. Even if this court were to find access which we submit that there is no reasonable possibility of that or proof of a reasonable possibility, the appellees would still be entitled to judgment on substantial similarity. Nobody has identified a single original element of plaintiff's work that was allegedly copied. The sine qua non of copyright is originality as this court knows. It's been discussed in a number of cases but the Feist Supreme Court case clearly says that there must be original material in order to have protection. This court in Murray Hill says that the first step in any copyright substantial similarity analysis is to strip out or filter out the unprotectable elements, scenes of fare, common treatments before the substantial similarity comparison takes place. The plaintiff in his deposition which is in the record at 296.1, he failed to identify any point of substantial similarity between his work and the defendant's work. Mr. Resigliano says in the record at 290 that there is no original material in the plaintiff's work that's substantially similar to anything in the defendant's work. And for those reasons, Your Honor, the appellees maintain the decision of the district court was correct and that this court should affirm summary judgment. There was a point made, Mr. Ramey made a point, the second of his three that he didn't address during the substance of his argument is that in order to find independent creation, there must be proof that a defendant finishes its work before the plaintiff starts its work. I haven't seen that argument anywhere in the briefs, haven't heard it before, don't know of any support for it. And his third point is that the court didn't do a substantial similarity analysis. We're aware of no authority, Your Honors, that would require the court to perform a substantial similarity analysis in a situation like this where the court entered summary judgment in favor of the defendant on the issue of access, but for the reasons I've already explained, if this court were to find that were the law remand would not be necessary because the record supports a finding that there is no substantial similarity of any original part or any original or protectable part of the plaintiff's song. Counsel, help me here on the chain because I'm not sure I got everything right on my own notes. It gets to Bartley, that's at least supported. From Bartley it could get to Greenwood either directly or through Phillips, at least that's the theory. Is that fair? That's the theory. Well, it's a little cloudy. Both Bartley and Phillips had some connection with Greenwood, in some way. Okay, Greenwood has an agent, the agent is Gordon. Ralph Gordon is a retired lawyer. But he's an agent. He passes things on to other people. Now, Reed and Wiseman work for Alamo? They were under contract with Alamo. So essentially that would be the last step in this chain that Gordon somehow gets it to them. McGraw is beyond Reed and Wiseman.  Reed and Wiseman wrote the song. So is that fair that those are the steps that you would have to make if you wanted to make the chain? Yes. And that would be described in the case law as a tortuous chain of hypotheticals. It's interesting whether I've got the right names and the right people. That is one chain. The plaintiff offers other chains that are similar, but that is one of the chains that the plaintiff offers. Thank you. Thank you, Counsel. Thank you. If I may begin. To address just a couple of issues I left off as we were discussing substantial similarity and striking similarity. One of the reasons we contend that the district court erred by not performing any analysis is that if there is a finding, and we talked, and Defendant's Counsel and Appellee's Counsel talked about it, a striking similarity analysis, that does lower the quantum of proof required for access. Here we allege that at least the intro, and if not the expression of the protectable ideas from this, are strikingly similar, and that there needed to have been some analysis done there. As the evidence showed, Mike Reed said that the intros to the song that he wrote, and that he purportedly wrote, and the songs to the Martinez one that was written before his, were substantially similar. He testified to that in deposition. And then we have Melanie Shelley saying that she couldn't tell the difference between the Martinez intro, the Reed-Wiseman intro, or the McGarrel intro. And then we also had. Who is she? She was the, you heard of the hairdresser that we talked to at the time. She was also connected to David Bartley at that time. She was the hairdresser that did all his. She's not a musicological expert of any sort. No, but, no, no. She's an ordinary observer, precisely, Your Honor. And then we had the song plugger, Missy Gallimore, couldn't tell the difference between the intros of the three songs either. She said that they all sounded the same. And that's our point that's very highly relevant. What they sounded the same as was based on this original tape or on something else? Based on the original, yes, the original copyright collection, as I understand. Yes, Your Honor. But wait a minute, because I thought there was this discussion from Judge White's question about the tape went to Bartley and we don't know what happened to the tape. Is this Martinez's contemporaneous copy of what he gave Bartley? Correct, yes, Your Honor. Yes, Your Honor. And then we have, from that, we have the ordinary observer not being able to tell the difference. Why that's important is McGraw has been interviewed, and there's evidence of record in this file or evidence that could be made admissible for trial. He only listens to the first 10 or 15 seconds. These intros are 12 to 13 seconds. That's why we feel a substantial similarity analysis needs to be done, at least to see if there is striking similarity. If we go, this case is not, and we'll get to that in a second, but this case does have evidence of record that's in our briefing concerning the similarity between the songs, between the expression of the ideas that we feel are protected. Each song is about a four-lung lover who grew up together with a woman in their small town. One of those people leaves, and this person doesn't really see her in another place. And this is in the briefing, but he thinks he sees her in other places. This is content that no one has identified. They're all about stuff like that. Well, they're all about losing girlfriends and losing boyfriends, but they're not about the chain of the way this is expressed is what is the copyright protectable element, because what's protectable in every way then? Why does it have a copyright? How do we define its protectable elements? They can be defined in this same way, Your Honor. As the briefing contains, we would say that that's the protectable element. And, in fact, if you go to the declaration I submitted in response to the motion for summary judgment, Exhibits 3 and 4, those are the lyrical analysis of Anytime, Anywhere, Amanda and Everywhere, and that contains a side-by-side comparison where there is a lot of similarity. And if you look, the chord progression is the same. Sonically, many of the chords sound precisely the same. Where did that stuff come from? Those are the songs, the copyright song from Martinez and the lyrics written from the McGraw version of Everywhere. No, no, that's not what I'm saying. Are you saying that the progressions are the same? Sonically, it's the same. I mean, do you need an expert witness for that? I don't think you do, Your Honor. I think that's sonic, so you can understand. You play it to the ordinary observer. Does that sound the same? That's why I think you do. That evidence is admissible and needs to have been considered by the court. That Daniel Sanders tried to get in, that wasn't considered. I'm out of time. I finished up my argument quickly. This case is not unlike Brainerd v. Vassar. That was the one I ended on last time. The court said it's a relatively low burden for access, and because the song was in possession of the manager's office and was passed on to the record label, that was sufficient to establish access. Here we have the song going to Lee Greenwood and over to the publishing company and to the writers, and we think that's enough to establish access. These people were communicating together at the same time, in the same place, about the same thing, to create songs for Tim McGraw's everywhere that everyone knew he was doing in Nashville. This was a big deal, and that's what it was written for, and I thank the court very much, and we ask that the court reverse the grant's summary judgment. Thank you. Counsel, the case will be submitted. Court may call the next case.